IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No.: 1:12-MJ-36 |
| | ) | |
| DEREK ZACHARY STEVENS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Andrew B. Lenhart, being duly sworn, depose and state as follows:

1. Since September 2003, I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency. During my tenure as a Special Agent with the FBI, I have been involved in many criminal investigations, including those that pertain to prescription narcotics trafficking. I have worked with, and am familiar with, various investigative techniques utilized by law enforcement, including, but not limited to, purchasing narcotics from suspected drug traffickers and distributors as evidence of drug trafficking. I have interviewed numerous individuals involved in narcotics trafficking and have obtained information from them regarding the acquisition, sale, and distribution of controlled substances, including prescription narcotics. Through my training and experience, I am familiar with the techniques and methods by which drug traffickers distribute controlled substances. I am also familiar with the use, effects, appearance, and methods of manufacturing controlled substances.

2. As a federal agent, I am authorized to investigate violations of the laws of the

1

United States, make arrests, and serve and execute search and arrest warrants issued under the authority of the United States. In the course and scope of my duties, I have helped execute numerous search and arrest warrants.

3. This affidavit supports a criminal complaint and arrest warrant for the following person: DEREK ZACHARY STEVENS. The complaint charges a conspiracy from in or about November 2010 to in or about June 2011 to knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with others to distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

4. Title 21, United States Code, Section 841(a)(1) prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance. Title 21, United States Code, Section 846 prohibits any person from attempting or conspiring to commit any offense in the same subchapter, including those described under Section 841(a)(1). Title 21, Code of Federal Regulations, Section 1308.12(b)(1)(iii) specifies that oxycodone is a Schedule II controlled substance. According to the Drug Enforcement Agency's scheduling parameters, Schedule II controlled substances have a currently accepted medical use in treatment in the United States, but they generally are subject to comprehensive restrictions and regulations because they have a high potential for abuse, and their abuse may lead to psychological or physical dependence.

5. OxyContin is a brand name drug containing pure oxycodone. The Physician's Desk Reference Manual (2008 Edition) describes OxyContin as follows:

> ... OxycontinTM (oxycodone hydrochloride controlled-release)
>
> WARNING:

Oxycontin is an opioid agonist and a schedule II controlled substance with an abuse liability similar to morphine. Oxycodone can be abused in a manner similar to other opioid agonists, legal or illicit. This should be considered when prescribing or dispensing Oxycontin in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse, or diversion.

... TABLETS ARE TO BE SWALLOWED WHOLE, AND ARE NOT TO BE BROKEN, CHEWED OR CRUSHED. TAKING BROKEN CHEWED OR CRUSHED OXYCONTIN TABLETS COULD LEAD TO THE RAPID RELEASE AND ABSORPTION OF A POTENTIALLY TOXIC DOSE OF OXYCODONE.

6. Through my training and experience, I am familiar with oxycodone. It has become popular among abusers of pharmaceutical drugs. Addicts often crush it and snort the powder. Addicts also are known to defeat the time-release mechanism of pills containing oxycodone by eliminating the outer coating of the pills, thus allowing the oxycodone to be absorbed into the body faster than intended by the manufacturer. In addition, I am aware that drug addicts frequently exchange prescription narcotics, such as oxycodone, for other illicit narcotics such as cocaine or cocaine base. Pills containing oxycodone frequently sell on the street for $1 per milligram of oxycodone, and are manufactured in 5 mg, 10 mg, 15 mg, 30 mg, 40 mg, 60 mg, and 80 mg strengths. Historically, OxyContin 80 mg pills were the drug of choice among users. To prevent abuse, in April 2010 the manufacturers of OxyContin 80 mg added a component to its mixture that deters its ability to be crushed, snorted, and/or injected (in a solution). As a result, over approximately the past year, oxycodone 30 mg pills have become the drug of choice because they still retain their ability to be crushed, snorted, and/or injected.

7. The facts and information contained in this affidavit are based upon my personal knowledge of this investigation as well as the observations of other law enforcement officers involved in this investigation.

8. This affidavit contains information necessary to support probable cause for the criminal complaint and arrest warrants. The affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## CONFIDENTIAL INFORMANTS

9. The information in this affidavit was obtained largely with the assistance of three confidential informants.

10. I interviewed Confidential Informant 1 (hereinafter referred to as "CI-1") on or about June 28, 2011; July 25, 2011; August 3, 2011; and November 2, 2011. CI-1, who has provided the government with reliable information regarding drug activity in the past, was convicted in the Eastern District of Virginia on drug-related charges. In exchange for his/her cooperation, CI-1 hopes to receive consideration for a Rule 35 Motion to Reduce Sentence.

11. I interviewed Confidential Informant 2 (hereinafter referred to as "CI-2") on or about June 28, 2011; July 26, 2011; August 4, 2011; and October 25, 2011. CI-2, who has provided the government with reliable information regarding drug activity in the past, was convicted in the Eastern District of Virginia on drug-related charges. In exchange for his/her cooperation, CI-2 hopes to receive consideration for a Rule 35 Motion to Reduce Sentence.

12. I interviewed Confidential Informant 3 (hereinafter referred to as "CI-3") on or about May 5, 2011; May 10, 2011, and July 7, 2011. CI-3 has provided the government with reliable information regarding drug activity in the past. CI-3 is not receiving any consideration regarding federal charges in the Eastern District of Virginia.

## OVERVIEW OF THE CONSPIRACY

13. From in our about 2010 through in or about 2011, STEVENS and others knowingly, intentionally, and unlawfully combined, conspired, confederated, and agreed among themselves and with others to distribute oxycodone to individuals residing in the Eastern District of Virginia. Specifically, from in or about November 2010 through in or about June 2011, STEVENS sold OxyContin pills to a number of individuals in Prince William County in the Eastern District of Virginia.

14. According to CI-1 and CI-2, STEVENS obtained oxycodone pills from a relative who was aware that STEVENS was selling the pills for profit. CI-1 said that he/she had accompanied STEVENS to the relative's residence, which is located near the Quantico Marine Corps Base within the Eastern District of Virginia, for the sole purpose of obtaining oxycodone pills.

### CI-1

15. CI-1 has known STEVENS for several years. In or around July 2010, an individual told CI-1 that STEVENS was involved in selling oxycodone pills. In or around November 2010, in Prince William County, in the Eastern District of Virginia, CI-1 purchased approximately 40 oxycodone 30 mg pills from STEVENS for $1,000 on behalf of CI-2. Over approximately the next month, CI-1 purchased approximately 40 oxycodone 30 mg pills from STEVENS on two other occasions for $1,000 on behalf of CI-2.

16. In or around January 2011, CI-1 introduced STEVENS directly to CI-2, who then began purchasing oxycodone 30 mg pills directly from STEVENS. STEVENS was aware that CI-2 was re-selling the oxycodone 30 mg pills but became upset when he found out that CI-2 was charging $40 per pill. As a result, STEVENS tried to raise the price he was selling the

oxycodone pills to CI-2. STEVENS and CI-2 frequently argued over the price of the oxycodone 30 mg pills but STEVENS continued to sell the oxycodone 30 mg pills to CI-2 through June 2011.

### CI-2

17. CI-2 met STEVENS in or about January 2011. From in or about February 2011 through in or about June 2011, CI-2 purchased 30 to 50 oxycodone 30 mg pills for $25 to $35 per pill on at least 20 different occasions from STEVENS. All of these purchases occurred in Prince William County, Virginia, in the Eastern District of Virginia. STEVENS told CI-2 that his cousin, who lived near the the Marine Corps Base at Quantico, Virginia, was the source of the pills.

### CI-3

18. In or about the spring of 2011, CI-3 became aware that STEVENS was selling quantities of 50 to 70 oxycodone 30 mg pills at a time. STEVENS was purchasing the prescriptions of other persons in Culpeper, Virginia. CI-3 was aware that STEVENS's cousin was providing STEVENS with oxycodone 30 mg pills to sell. CI-3 was also aware that STEVENS was involved in trafficking oxycodone with at least four individuals, including CI-2 and CI-1.

19. On or about May 12, 2011, while under surveillance by federal agents, CI-3 engaged in a controlled drug transaction with STEVENS in the 8,000 block of Liberia Avenue in Manassas, Virginia, within the Eastern District of Virginia. At approximately 4:46 p.m., STEVENS arrived in a Gray Ford Explorer and parked next to CI-3's vehicle. Federal agents observed STEVENS exiting his vehicle and entering CI-3's vehicle. While inside the vehicle, STEVENS engaged in a conversation with CI-3 about STEVENS's past narcotics

transactions with CI-2. Federal agents recorded the conversation. In it, STEVENS can be heard saying: "when he'd run out, I'd go get my shit from my cousin down at Quantico and fuckin' sell it to him . . . and they were the M's . . . and we'd buy 50 of them at fuckin' 1,500 dollars, 30 apiece, all the way up . . . and here recently we came to a fuckin' agreement 'cause we been goin' back and forth with these fuckin' prices." During this discussion, CI-3 provided STEVENS with $300 in exchange for ten small blue pills purported to be oxycodone 30 mg. At the end of the transaction, STEVENS exited CI-3's vehicle and stated, "just don't let the word out. I got plenty more of them. So if you need more, just hit me up."

\* \* \* \* \*

## CONCLUSION

20.     Based upon the foregoing, I submit that there is probable cause to believe that from in or about November 2010 through in or about June 2011, within the Eastern District of Virginia, defendant STEVENS knowingly, intentionally, and unlawfully combined, conspired, confederated, and agreed with others to distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

_____
Andrew B. Lenhart
Special Agent, FBI


Sworn and subscribed to before me this 25th
day of January, 2012, at Alexandria, Virginia.


_____/s/_____
John F. Anderson
United States Magistrate Judge